CLEMENT BROTHERS COMPANY, INC. v. NORTH CAROLINA DEPART-
MENT OF ADMINISTRATION AND APPALACHIAN STATE UNIVERSITY

No. 8110SC870

(Filed 1 June 1982)

1. **Contracts § 30— construction contract—refusal of stop order for bad
   weather—arbitrariness—remission of mitigated damages**
   
   Where an addendum to a contract for construction of a dam and water
   reservoir provided for construction shutdowns with the mutual consent of the
   parties because of severe winter weather conditions, plaintiff received a stop
   order to suspend its operations temporarily during adverse weather conditions
   in the winter of 1971-72, and the parties stipulated that the weather conditions
   were substantially the same during the winter of 1971-72 and the two follow-
   ing winters, defendants acted arbitrarily and capriciously in notifying plaintiff
   in August and November 1972 that it would permit no further shutdowns
   because it was concerned about the project conclusion date, and the trial court
   properly required defendants to remit a portion of the liquidated damages
   which had been assessed against plaintiff for tardy completion of the project.

2. **Contracts § 12— interpretation of contract—payment for wasted materials**
   
   In an action arising out of a contract for construction of a dam and reser-
   voir, the trial court properly determined that plaintiff was not entitled to com-
   pensation for rock excavated from the quarry area but wasted because it was
   not suitable for use in the dam embankment at the unit price for common ex-
   cavation since paragraphs of the contract providing that there would be no
   separate payment for waste excavation controlled over the more general provi-
   sions which defined common excavation to include the "removal and disposal of
   all other materials from the project site which is not classified as rock or
   structural excavation."

APPEAL   by plaintiff and defendants from *Godwin, Judge.*
Summary judgment entered 9 June 1981 in Superior Court, WAKE
County. Heard in the Court of Appeals 5 April 1982.

This action arises out of a contract for construction of a dam
and reservoir to provide water for Appalachian State University
in Boone. After being assessed liquidated damages of $89,400 for
the tardy completion of its portion of the project, plaintiff-
contractor appealed the assessment to the State Department of
Administration. At the hearing before the Secretary of the
Department, plaintiff protested the liquidated damages assess-
ment and claimed it was entitled to payment for excavation of
material which was not suitable for use as rock in the dam struc-
ture and to payment for the cost of labor inefficiency that
resulted from defendants' requiring plaintiff to work during
periods of winter weather. After plaintiff's claims were denied by
the Secretary, it then filed a complaint in Superior Court re-

questing the same relief it had sought from the Department of Administration. Defendants filed an answer denying that plaintiff was entitled to the relief requested. Both parties moved for summary judgment. The parties entered into a stipulation of the facts. After a hearing on the motions, the court made extensive findings of fact, based upon the stipulated facts, and allowed defendants' motion for summary judgment on the claim for excavated materials and for the cost of labor inefficiencies and allowed plaintiff's motion for partial summary judgment on the liquidated damages issue.

*Attorney General Edmisten by Special Deputy Attorney General T. Buie Costen for the State, defendant appellant-appellee.*

*Griffin, Cochrane & Marshall by Harry L. Griffin, Jr., and Bowman S. Garrett, Jr.; Everett, Creech, Hancock & Herzig by William G. Hancock for plaintiff appellant-appellee.*

CLARK, Judge.

## DEFENDANTS' APPEAL

[1] Defendants contend that the court erred in granting plaintiff's motion for partial summary judgment which required that defendants remit part of the liquidated damages assessed against plaintiff. This issue involves an interpretation of the provisions of Addendum No. 3 to the Contract between the parties, which reads as follows:

"SECTIONS III, IV, V, VI, VII, VIII, IX, AND X:

The time of 540 days for completion of the above listed sections of the project has brought objections from various contractors who are concerned over the bad winter weather.

In lieu of extending the time of completion for those Sections of the Project the following will govern this phase of the work:

'With the mutual consent of the Contractors and the Engineers, in event of winter weather conditions which are not in the best interest of the Owner and Contractor a stop-order will be issued until such time as working conditions im-

prove to a point that the work can be resumed to the mutual benefit of all parties. This stop-order shall be issued only on severe winter weather conditions. The time the stop-order is in effect will not be included in the Contractors [*sic*] calendar days time for completion of the project.' "

Plaintiff requested and received a stop order to suspend its operations temporarily during adverse weather conditions in the winter of 1971-72. A series of letters was transmitted between the parties concerning a shutdown for bad weather during the winter of 1972-73. In August 1972, defendants advised plaintiff that it was to proceed with construction of the dam to meet the 30 May 1973 completion date and that no further shutdowns would be allowed. Although the record is not clear on this point, it appears that the August letter was not in response to a request for a shutdown by plaintiff, but the result of defendants' concern that the project was behind schedule. In November 1972, plaintiff was denied a stop order for the winter of 1972-73. From the defendants' course of conduct, plaintiff did not request a shutdown for the winter of 1973-74, believing any such request would be futile. The parties stipulated that the weather conditions were substantially the same in all three of the winters in question. Plaintiff was assessed liquidated damages of $89,400 for 447 days of downtime.

Defendants contend that their refusal to grant shutdowns during the winter seasons was not arbitrary but was in compliance with the contract provisions requiring "mutual consent" before a stop order was issued. The trial court, however, disagreed, concluding as a matter of law that:

"4. Defendants' action in advising plaintiff in August and November, 1972, that no further arrangement would be made for work stoppage was arbitrary and not in accordance with contract requirements that reasonable consideration be given by both parties to a work stop order in the event of severe winter weather conditions not in the best interest of both parties.

5. Material issues of fact exist as to the severity of winter weather conditions and their duration during 1972-73 and 1973-74 which plaintiff and defendants are entitled to have determined by further proceedings in this cause. Plain-

tiff is entitled to remission of liquidated damages for any such period of severe winter weather conditions during 1972-73 and 1973-74 which may be established in such proceedings and defendants are entitled to credit that portion of additional 135-day time extension at the project's end which was granted by reason of such winter weather conditions against any period so established."

Our courts have held that the heart of a contract is the intention of the parties, which is to be determined from the language, the purposes and the subject matter of the contract and from the situation of the parties at the time the contract was executed. Any ambiguity in a written contract is to be construed against the party who prepared the instrument. *Adder v. Holman & Moody, Inc.*, 288 N.C. 484, 219 S.E. 2d 190 (1975). The language of the addendum itself reveals that contractors who were bidding on the water reservoir project were concerned about the effect the severe winter weather in Boone would have upon the construction. Therefore, defendants agreed to the addendum which provided for shutdowns with the mutual consent of the parties. While defendants were not required to grant a stop order simply because plaintiff requested it, the addendum would be of no value whatsoever if the defendants could unilaterally and unreasonably refuse to grant stop orders when there were severe winter weather conditions. The effect of such an interpretation would be to defeat the purpose for which the addendum was executed. Plaintiff and other bidders relied upon the language in the addendum that stop orders would be permitted under severe weather conditions and prepared their contract bids accordingly. We hold that defendants' notification to plaintiff in August and November 1972 that it was concerned about the projected completion date and would allow no further shutdowns was arbitrary and capricious. We can find no rational basis for defendants' granting a shutdown one winter while refusing it the following equally severe winter. *See Missouri Roofing Co. v. United States*, 357 F. Supp. 918 (E.D. Mo. 1973); *DeArmas v. United States*, 70 F. Supp. 605 (Ct. Cl. 1947); Annot., 85 A.L.R. 3d 1085 (1978).

The court properly granted plaintiff's motion for partial summary judgment on this issue.

PLAINTIFF'S APPEAL

[2]   Plaintiff assigns as error the court's determination that plaintiff was not entitled to compensation for material excavated and wasted from the quarry area at the unit price for common excavation and its granting of defendants' motion for summary judgment with respect to the excavated material. Plaintiff argues that during the excavation of the quarry to obtain rock suitable for placement in the dam embankment, it removed not only overburden and rock for the embankment, for which it was paid, but also other rock material for which it has not been compensated. Plaintiff contends that it is entitled to compensation for this material under the terms of the contract specifications. This material was found beneath the overburden and was not suitable for placement in the embankment but was hauled off and wasted. The contract required plaintiff to excavate three types of material, for which it would be paid varying amounts: common excavation, rock excavation and structural excavation.

Plaintiff contends that the wasted material should be classified as common excavation, which is defined by paragraph 2.3.03-a. of the contract as follows:

"Common excavation shall consist of and include all earth, clay, sand, silt, gravel, hard and compacted materials such as hardpan, loosely cemented gravel, soft or disintegrated rock and similar materials that can be removed by hand, heavy ripping equipment, or common earthmoving equipment such as tractor-drawn scrapers, power shovels, backhoes and bulldozers and shall also include all boulders and loose rock less than one (1) cubic yard in volume. Common excavation will include removal and disposal of overburden material within the limits of the quarry and spillway as shown on the plans, removal and disposal of unsuitable foundation material from within the limits of construction of the dam, removal and disposal of material from the core trench to the top of rock, and removal and disposal of all other material from the project site which is not classified as rock or structural excavation."

In its brief plaintiff points out that the definition of common excavation includes all material from the project site that does not fall into the classifications of rock or structural excavation.

Therefore, plaintiff claims that it should be reimbursed for this material pursuant to payment rates for common excavation. The court found, however, that the definition of common excavation did not include material below overburden excavated from the quarry and spillway area. We agree.

Paragraph 2.3.03-b. of the contract states that "[a]ll loose or soft rock shall be removed without extra cost to the Owner; . . . The Contractor shall make his own arrangements for any off-site disposal of any excess earth resulting from excavation work." Further, Paragraph 2.3.08 provides:

"b. Rock Excavation:

(1) Measurement:

There will be no measurement of rock excavation.

(2) Payment:

The costs incurred by the Contractor for rock excavation will not be paid for directly. Payment for rock excavation shall be considered as incidental to and included in the items of Rolled Rock Fill, Compacted Coarse Filter, and Compacted Fine Filter."

Paragraph 2.3.04, Disposal of Excavated Materials, states:

"All suitable materials from required excavation shall be placed in the permanent work to the extent required to complete the project. Unsuitable materials together with all excess material shall be placed in the designation area established for waste and excess excavation. The Engineer will be the sole judge regarding the suitability of material for incorporated [sic] into the project."

All of these provisions indicate that the parties anticipated that there would be some waste material from the excavation which would be unsuitable for use in the reservoir area. The provisions also show that there would be no separate payment for waste excavation.

While the definition of common excavation (paragraph 2.3.03-a.) includes "removal and disposal of all other material from the project site which is not classified as rock or structural excavation," we agree with the trial court's conclusion of law that:

"1. The contract must be construed in its entirety with specific provisions relating to excavation from the quarry and spillway area controlling over the more general provisions relating to common excavation. When so construed, the contract does not require payment for this material at the unit price for common excavation."

*Accord, Contracting Co. v. Ports Authority,* 284 N.C. 732, 202 S.E. 2d 473 (1974).

We find that the court properly granted defendants' motion for summary judgment on this issue.

## RESULT

In defendants' appeal, affirmed.

In plaintiff's appeal, affirmed.

Chief Judge MORRIS and Judge MARTIN (Harry C.) concur.